UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SSI TECHNOLOGY, INC.,

    Plaintiff/Counter-Defendant,

vs.

COMPAERO INC.,

    Defendant/Counter-Plaintiff.
_____/

Case No. 13-CV-12672

HON. GEORGE CARAM STEEH

## OPINION AND ORDER

This action arises from a contractual dispute between SSI Technology, Inc. ("SSI") and Compaero Inc. ("Compaero"). SSI alleges that Compaero materially breached the parties' contract by failing to comply with the specifications and delivery schedules specified in the purchase orders. Compaero filed a counterclaim, alleging that SSI was the first to breach the contract by failing to timely pay for shipments accepted. The court denied summary judgment on SSI's complaint, and granted summary judgment in favor of Compaero on its counterclaim. The court conducted a bench trial on SSI's breach of contract claim and now delivers its opinion and order.

## FINDINGS OF FACT

SSI was awarded a BASS-D contract with the United States Department of Defense to supply 3,000 kits, each made up of 150 to 200 parts, to be used in modifying the Bradley fighting vehicle. The contract was projected to result in $26.3 million in revenue to SSI over the course of thirteen months. In order to fulfill the contract with the Department of Defense, SSI subcontracted to procure parts from over 50 different

-1-

vendors, one of which was Compaero. Compaero was to manufacture various parts, including backshells, shrink boots, and other connector accessories, which SSI would then use to manufacture leads and harnesses under the BASS-D contract. Compaero also contracted to manufacture a molded harness. On March 14, 2012, March 22, 2012 and May 18, 2012, SSI issued Purchase Orders 70934, 71003, and 71339, respectively. Compaero accepted the Purchase Orders, which included part specifications, delivery schedules, and payment terms. This was a large contract for Compaero, totaling approximately $1.3 million in revenue.

I. Alleged Breaches by Compaero

SSI's President and sole shareholder, Robert Bloom, and its Chief Operating Officer Gary Kippe, both testified that throughout the parties' contractual relationship Compaero was consistently late in making deliveries. Both witnesses also testified that Compaero had quality problems with the molded harnesses and was never able to deliver the 250 per month ultimately required under the contract. In fact, of the 3,000 molded harnesses contemplated by the contract, Compaero only delivered 1,805. Bloom and Kippe testified that government representatives closely scrutinized SSI's performance under the BASS-D contract, repeatedly taking issue with the fact that SSI's performance under the government contract was late.

When asked why SSI ultimately terminated its contract with Compaero, Mr. Bloom testified that it was because of late deliveries and quality issues. Mr. Bloom was not able to give exact dates of late deliveries because he did not have SSI's receiving records in front of him, but he knew Compaero was consistently late in its deliveries. Mr. Bloom testified that SSI accepted and paid for all non-defective parts delivered by

Compaero from April, 2012 until the contract was terminated in June, 2013. During that time period, Mr. Bloom stated that he did not give notice of any violations to Compaero. Bloom explained that SSI accepted the parts, even if late, because they needed them and were trying to make things work with Compaero. He deferred further questions on specific delivery and quality issues to Mr. Kippe, who handled the day-to-day operations for SSI.

SSI alleges that Compaero first breached the contract in May, 2012 when it failed to apply adhesive to certain parts. As evidence, SSI points to an email from Compaero's Vice President of Sales and Marketing, Robert Small, to SSI dated May 8, 2012. (Plaintiff's Exhibit 12, Defendant's Exhibit O[1]). In the email, Mr. Small explains that Quote 341687 is not valid because he did not quote all of the parts with adhesive, which is a $1.00 charge. "I am reworking the quote with the quantities you need now." This email does not support SSI's allegation that Compaero breached the contract by failing to apply adhesive as required. Rather, the email is evidence of a mistake in a quote requested by SSI. Both Mr. Kippe and Mr. Small testified that SSI did not place any orders based on the quote. As this exhibit does not support a breach by Compaero, it follows that there could not have been any notice of breach by SSI.

In June of 2012, SSI sought a Return for Materials Authorization ("RMA") to return 90 adapters, part number 2-210-7200, received from Compaero. (Exhibit 14, Exhibit H). SSI suggests that the RMA is evidence that Compaero breached the contract by delivering defective parts. However, the RMA issued by Compaero states

---

[1]Hereinafter, citations to exhibits will be by number for plaintiff's exhibits and by letter for defendant's exhibits, i.e., (Exhibit 12, Exhibit O).

that the return was a result of SSI's incorrect drawing and was being undertaken as a customer convenience. The RMA further notes that a credit would be issued upon receipt of the returned parts. Mr. Small testified that Compaero helped SSI fix a problem on its end by allowing SSI to return 90 right angle adapters that they ordered, and to place an order for straight adapters instead. Mr. Kippe acknowledged that the documentation presented at trial supports this interpretation. This incident is not evidence of a breach by Compaero.

Mr. Bloom, Mr. Kippe and Mr. Small testified that the contract contemplated that the molded harnesses had to pass First Article Testing ("FAT"), which required that a sample part demonstrate it met all specifications before the government would accept it. According to Mr. Kippe, the FAT for the molded harnesses was targeted to take place in May, but actually took place in July or August. Compaero had several failed attempts before its molded harnesses passed FAT. Several emails were admitted into evidence from Mr. Small to Mr. Bloom and Mr. Kippe in June and July, 2012 that refer to problems Compaero was having manufacturing the overmolded harnesses for FAT.

On June 5, Mr. Small wrote, "going slower than they expected - will know by tonight". (Exhibit 13, Exhibit J). Mr. Kippe understood this email to mean that the building of the molds for the overmolded harnesses was going slower than expected. On June 15, Mr. Small wrote, "Our reworked mold did not come in yet, they are not done reworking it and will have it complete on Monday." (Exhibit 15, Exhibit P). Mr. Kippe explained that in this email, Mr. Small was reporting a delay due to the reworking of a mold because the part did not come out right. Mr. Small testified that Esstech

Engineering was subcontracted to build the mold for the overmolded harness. The purpose of the emails was to keep SSI informed of the status of the molded harnesses.

On July 8, Mr. Small wrote that he started overmolding the FATs and both his mold and machine were damaged. Mr. Small apologized for Compaero's production problems and indicated that he was unable to produce the molded harness as required under the contract. Small suggested that if an alternate design was approved, he could offer the different adaptors at cost. (Exhibit 17, Exhibit P). Mr. Kippe testified that Compaero's delays at the FAT stage impacted SSI's contract with the Department of Defense, but he could not say exactly how they got past the delay problem. Mr. Kippe explained that during this time frame the government was constantly monitoring SSI's activity with regard to the BASS-D program, but he did not have any of the documents that would show the delays. Mr. Kippe testified that the government did not assess any fines against it for delays in 2012, and speculated SSI must have received an extension from the government for the FATs.

Mr. Bloom sent an emailed response to Mr. Small on July 9, stating that Compaero may not walk away from its obligation on the molded harnesses. As to Mr. Small's suggestion of an alternate design, that would set the entire program back months, which the government would not accept. Mr. Bloom then urged Mr. Small to make the molded harness work. (Exhibit 17, Exhibit P).

SSI submitted documents and testimony regarding other problems Compaero experienced in manufacturing the molded harnesses, including missing markings and a cut (Exhibit 19, Exhibit Q) and failed leakage testing (Exhibit 20) that relate to problems before the FAT was passed. These issues are not of much relevance to SSI's breach of

contract case against Compaero. Despite its complaints that Compaero delivered non-conforming goods at times, there was no evidence of resulting damages, no rejection of any goods, and upon filing this action, SSI sought injunctive relief to force continuing deliveries.

Regardless of all the problems with the molded harnesses, SSI did not terminate the contract with Compaero. Mr. Kippe and Mr. Small both explained that they did what was necessary to maintain the relationship, each witness analogizing the situation to a marriage, which requires compromise when things are not going smoothly. In fact, the parties did continue to work together. Eventually Compaero's overmolded harness passed FAT, but deliveries were not made exactly as required by contract.

Compaero submitted evidence that SSI did not provide all the parts it was obligated to provide in order for Compaero to manufacture the harnesses. A July 30, 2012 email from Robert Small indicates that SSI provided the wrong size braid that did not fit over a cable as required, so Compaero was unable to assemble the part. (Exhibit J). On Sept 18, 2012, Mr. Bloom sent an email to Mr. Small informing him that SSI was being short-shipped parts by Avnet that SSI was to supply to Compaero for the harnesses Compaero was manufacturing. Mr. Small testified that Mr. Bloom inquired whether Compaero would be able to supply the missing part themselves. (Exhibit J). Mr. Small testified that its inability to supply the required number of molded harnesses was often due to the fact that SSI did not supply it with all of the parts it needed to assemble the harnesses, and that if SSI had supplied all the parts needed, Compaero could have completed 250 molded harness assemblies per month.

II. <u>Alleged First Breach by SSI</u>

Compaero maintains that SSI's claim for breach of contract is barred as a matter of law due to SSI's prior breach of the contract for failing to abide by the payment terms, failing to provide adequate notice of breach, and failing to meet its burden of proof that the alleged breaches actually occurred and were substantial.

The original contract terms provided that SSI was to pay Compaero for parts within 30 days of delivery, or "net 30." The record evidence shows that SSI fell behind on the 30 day terms almost immediately. In September of 2012, the parties agreed to change the payment terms to net 60 days as an accommodation to SSI.

Compaero's payment history records show SSI's first payment was received on June 21, 2012 for a delivery on April 6, 2012. (Exhibit B). Compaero's CEO, Betsy Small, testified that according to the payment history, all of SSI's payments through August 2012 were over 30 days late, and almost all were over 60 days late.

SSI's own documents confirm that SSI was late in paying its invoices from Compaero. For example, invoices for deliveries made between April 6, 2012 and April 30, 2012 would have been due by May 30, 2012 to comply with the net 30 payment terms in effect at that time. However, SSI's records show that these invoices were actually paid on June 15, 2012. (Exhibit C).

Mr. Bloom testified that no matter what the records showed, he knows that SSI was never behind in payments. When he received emails from Mr. Small regarding late payments, Mr. Bloom checked with SSI's accounting department and was assured that SSI was not late with any payments. None of the accounting employees testified at trial. Mr. Bloom acknowledged receiving the emails from Mr. Small, but stated that he

did not agree with them. (Exhibit D). On March 27, 2013, Mr. Bloom emailed Mr. Small, stating that SSI's "average pay days 64". (Exhibit E). On the witness stand, Mr. Bloom acknowledged that because this was an average, some payments would have been less than 64 days and others older than 64 days.

Mr. Kippe also disputed that SSI was late in paying Compaero, though he admitted that the documents appeared to support Compaero's contention.

Much was made of a June 13, 2013 email from Robert Small to Matthew Granger of Esstech Engineering. (Exhibit 30). This email was sent immediately after Compaero terminated its contract with SSI. In the email, Mr. Small states that SSI is "at 60 days and hold to that for the most part." Since SSI was at net 60 days payment terms at the time, it appears to be an admission by Compaero that SSI was not behind on payments. Regardless of whether Mr. Small was downplaying Compaero's inability to handle SSI as part of merger posturing with Esstech, or whether Mr. Small lacked credibility in his testimony, the documentary evidence supports a finding that SSI was behind on its payments during the entirety of its relationship with Compaero.

On June 12, 2013, Mr. Small emailed Mr. Kippe and Mr. Bloom, unilaterally putting SSI on a credit limit and changing the payment terms to net 45 days, in accordance with an agreement made with Mr. Kippe. Compaero further stated that "All orders are now on hold." (Exhibit G). This notice clearly declared SSI had breached the agreement and indicated Compaero would resume performance if SSI made its payments current. On June 13, 2013, SSI sent an email to Compaero objecting to the unilateral change in payment terms and declaring that if the situation is not resolved, SSI will terminate the Purchase Orders for cause. (Exhibit Y).

III. <u>Compaero' Counterclaim</u>

The court previously found that SSI owes Compaero $153,471.86 for goods received and accepted under the contract. SSI does not dispute that this amount is owed, and acknowledges that it is no longer an issue of fact in the case. All of the payment evidence introduced at trial went to Compaero's theory that SSI's breach of contract claim is barred as a matter of law due to SSI's prior breach of contract for failing to abide by the payment terms.

## ANALYSIS

I. <u>First Breach</u>

In a Michigan Supreme Court case dating back to 1914, the court held that "'[h]e who commits the first substantial breach of a contract cannot maintain an action against the other contracting party for a subsequent failure on his part to perform.'" *Jones v. Berkey*, 181 Mich. 472, 480 (1914) (citation omitted). In applying this doctrine, courts in Michigan give the words "substantial breach" close scrutiny. "Such scrutiny discloses that the *application of such a rule can be found only in cases where the breach has effected such a change in essential operative elements of the contract that further performance by the other party is thereby rendered ineffective or impossible,* such as the causing of a complete failure of consideration. . . or the prevention of further performance by the other party . . . . *McCarty v. Mercury Metalcraft Co.*, 372 Mich. 567, 574 (1964) (citations omitted).

A breach is considered to be substantial when it "undermines the very essence of the contract, or 'goes to the heart of the agreement.'" *Able Demolition v. Pontiac*, 275 Mich. App. 577, 586 (2007). Where a contract to supply gasoline included a provision

that seller would pay buyer a rebate of $0.015 per gallon of fuel purchased by seller, the court held that seller's failure to pay the rebate was not a substantial breach. Rather, the agreement's overriding purpose was for the buyer to have a guaranteed supply of fuel, which it could sell to its customers and make a profit. The evidence showed that discontinuing the rebate did not make the buyer's performance under the contract impossible or ineffective. *Atlas Oil Co. v. Nassar*, 2010 WL 3389743 (Mich. App. 2010) (unpublished).

    A. <u>Alleged Breaches by Compaero</u>

The exhibits and testimony presented at trial demonstrate that Compaero did not always deliver the required number of molded harnesses on time under the contract terms. Some of the insufficient deliveries were excusable because SSI short-shipped certain parts required by Compaero. Other deliveries were late because of problems Compaero experienced with the overmolding process. Rather than putting Compaero on notice of breach, however, SSI urged Compaero to keep at it, at first until they could pass the FATs, and later until they could increase production. There is no clear evidence that SSI put Compaero on notice that it was in breach of the contract until after SSI received the termination notice from Compaero. (Exhibit Y). In SSI's email, Mr. Bloom writes, "While you were learning the molding process, we on your behalf spent an enormous amount to time and effort working the issues with you (and fighting our customer off)." (Exhibit Y). This supports the court's finding that SSI chose to work with Compaero, as one might work on problems in a marriage, rather than put them on notice of breach.

-10-

SSI presented testimony that Compaero's adherence to the delivery schedule was crucial in SSI's government contract with the Department of Defense. However, SSI's actions in accepting late and incomplete deliveries does not support a finding that Compaero's behavior "undermine[d] the very essence of the contract". In addition, SSI presented no evidence of sanctions or other consequences from the Department of Defense stemming from Compaero's nonconforming deliveries.

### B. Alleged Breach by SSI

There is ample evidence that SSI was in breach of the parties' contract starting in May of 2012 when SSI exceeded the contract's net 30 day payment terms. This fact is supported by documentary evidence prepared by SSI and Compaero in the regular course of their business. (Exhibit B, Exhibit C). Betsy Small's ledger notes show that she made regular attempts at collecting past due invoices starting May 31, 2012. Robert Small wrote several emails to Mr. Bloom regarding the need for SSI to become current on their account. (Exhibit D). The bald testimony of Mr. Bloom and Mr. Kippe that SSI was never late with any payments is simply not supported by the evidence.

To the extent there was a first breach in this case it was committed by SSI in failing to comply with the payment terms of the parties' contract.

## II. Notice of Breach

Where tender has been accepted, the buyer must, within a reasonable time after he discovers or should have discovered any breach, notify the seller of breach or be barred from any remedy. MCL 440.2607(3)(a); *American Bumper & Mfg. Co. v. Transtechnology Corp.*, 252 Mich. App. 340, 345 (2002). The purpose of the UCC's notice requirements is (1) to prevent surprise and allow the seller the opportunity to

-11-

make recommendations how to cure any nonconformance, (2) to allow the seller the fair opportunity to investigate and prepare for litigation; (3) to open the way for settlement of claims through negotiation, and (4) to protect the seller from stale claims and provide certainty in contractual arrangements.

Some courts have held it is not enough where a buyer merely notifies a seller that there is a problem with a transaction, but does not notify the seller that they are in breach. *Aqualon Co. v. MAC Equip., Inc.*, 149 F.3d 262, 268-69 (4th Cir. 1998); *K & M Joint Venture v. Smith Int'l, Inc.*, 669 F.2d 1106, 1113 (6th Cir. 1982) (applying Ohio law). This district has adopted the position that even if adequate notice is given at some point, subsequent actions by the buyer may negate its effect and the buyer's conduct, taken as a whole, must constitute timely notification that the transaction is claimed to involve a breach. *Contech Casing, LLC v. ZF Steering Systems, LLC*, 931 F.Supp.2d 809, 816 (E.D. Mich. 2013); see also, *American Bumper & Mfg.*, 252 Mich. App. at 348 (citing *Eastern Air Lines, Inc. v. McDonnell Douglas Corp.*, 532 F.2d 957, 976 (5th Cir. 1976)).

The parties' behavior in this case supports the testimony of Mr. Kippe, Ms. Small and Mr. Small (and the email communications of Mr. Bloom) that both parties to the contract were trying to work together to maintain the relationship and keep the contract going. Therefore, even to the extent SSI made it clear to Compaero that late or inadequate deliveries put SSI in an untenable position with the Department of Defense, by continuing to accept the deliveries and acquiesce to adjusted delivery schedules with Compaero, SSI's actions taken as a whole cannot be said to have provided timely notification of breach. SSI is therefore barred from any remedy for breach.

III. <u>Compaero's Counterclaim</u>

Judgment shall enter for Compaero on its counterclaim for breach of contract by SSI in the amount of $153,471.86.

## CONCLUSION

For the reasons stated in this opinion and order, judgment is entered against SSI on its breach of contract claim, and against SSI and in favor of Compaero on Compaero's counterclaim in the amount of $153,471.86.

Dated: September 3, 2014

                                        s/George Caram Steeh
                                        GEORGE CARAM STEEH
                                        UNITED STATES DISTRICT JUDGE

---

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on September 3, 2014, by electronic and/or ordinary mail.

s/Marcia Beauchemin
Deputy Clerk

---